Patrick J. Picariello, J.
Plaintiff taxicab driver sues both his employer (defendant Cross County Taxi Service, Inc.), said defendant employer’s association (defendant Metropolitan Taxicab Board of Trade), and the labor union of which he, the plaintiff, was and still is a member (defendant New York City Taxi Drivers Union, Local 3036, AFL-CIO).
The suit is brought by plaintiff to recover money withheld from his wages by his employer in March and April, 1971 allegedly without his consent.
Because of the impact this dispute may have upon the protection, comfort and convenience of the taxi-riding public and the general good and welfare of taxicab drivers in the city, the court feels a short narration of the history of negotiations by and among the several parties involved in this dispute, as reflected by the testimony adduced at the trial and other evidence, equated with the constant over-all public transportation policy governing taxi services promulgated by the City Council, is called for.
In the absence of any testimony or other evidence to the contrary, the court assumes, and it is a safe assumption under such circumstances, that the union represents a majority of the appropriate bargaining unit of which plaintiff is a member, and constitutes, therefore, the exclusive bargaining representative for all the employees of the union. In fact, by voluntarily joining the union, the plaintiff in effect designated the union as his representative for collective bargaining purposes.
The collective bargaining agreement between the union, as plaintiff’s exclusive bargaining agent, and his employer, was due to expire on November 16, 1970. Under the terms of this agreement which provided, inter alia, terms and conditions of employment, plaintiff and many others with like seniority in employ *517 ment, received as remuneration for their services 50% of the money booked each day on the meter. The amount of such remuneration was computed upon a rate which had been approved by the City Council, to wit, 45 cents for the first 1/5 mile and 10 cents for each additional 1/5 mile. Under the terms of this agreement, the employer was obligated to contribute 1% cents for every first drop of the meter to the taxicab industry pension fund, and 3% cents for every first drop of the meter to the union hospitalization and medical plan.
By due and proper notice, the union informed the employer of its intention to elect to terminate said collective bargaining agreement on its termination date. Negotiations to renew the agreement by and between the unions ’ negotiating committee and the employer’s association were initiated and commenced on June 4, 1970. Again, and in the absence of any testimony or other evidence to the contrary, the court assumes that the union negotiating committee was duly constituted in accordance with its constitution and by-laws.
To bargain collectively is the performance of the employer, through its association, and the employees, through the union negotiating committee, to meet at reasonable times and confer in good faith with respect to hours, wages and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written agreement incorporating any understanding reached by the negotiating parties at a ratification meeting of the memberships of each of the parties at meetings called for that purpose.
Negotiations were numerous, long, arduous and nonproductive. The court was not made cognizant either of the “ demands ” or “ proposals ” made on the employer association by the union negotiating committee on behalf of its employees, or the “ offers ” made to the union negotiating committee by the employer association on behalf of its employers. Nor is this information pertinent to the issue in this case. However, it became obvious during the negotiations that an adequate wage increase could not be successfully negotiated unless and until the City Council enacted legislation permitting the employer to increase its rates.
The City Council refused to enact such legislation unless a new agreement was first negotiated by and between the parties. The Mayor was approached to make recommendation to the City Council for such legislation. He indicated his willingness to make a recommendation to increase rates from 45 cents to 50 cents for the first 1/5 mile. This recommendation was to all intents and purposes considered inadequate by the negotiating *518 parties and precipitated the application of economic pressure by the union. At the taxi-riding public’s great inconvenience the strike lasted about two weeks. Finally, on December 19, 1970-, the Mayor indicated that he would recommend passage of legislation allowing a rate increase to 60 cents for the first 1/5 mile on condition, however, that both the union negotiating committee and the employer’s association covenant that 10 cents of each of the first drops of the meter be collected by the employer and be contributed by it to the pension, welfare, hospitalization funds and other fringe benefits for union members. Under this arrangement, plaintiff would not receive his 50% share of the said 10 cents of each drop of the meter. This commitment was given by both the union negotiating committee and the employer association. The necessary legislation increasing the rate was enacted by the City Council, signed by the Mayor and became effective as of March 2, 1971.
It will serve no useful purpose to delve into the whys and wherefores for the exactment of this commitment. The necessary legislation permitting an increase was enacted, the riding public was socked with the increase and is now paying it, amen.
The proposed collective bargaining agreement, including this commitment, was submitted for ratification to the union membership and was rejected by it.
Since March 2, 1971, the employer has been collecting this 10 cents and is holding the same in escrow for the purposes for which it was intended, pending, the court assumes, ratification of the collective bargaining agreement by the union members.
It is to recover his 50% of this 10 cents withheld by the employer without his consent, as alleged by him, that plaintiff has instituted this action.
G-rave and serious accusations were made by the plaintiff against the union administration, the unions’ negotiating committee, the employer and the employer association during the course of the trial. Whether or not the union negotiating committee had authority to make the commitment and/or whether or not it exceeded its authority in the negotiations in so doing, is not within the issues in this case. Whether or not the union betrayed its membership, as alleged, is not within the province of the court to determine. Whether or not the union and the employer conspired against the union members so as to take the employer ‘ ‘ off the spot ’ ’ by making the commitment is again dehors the issues herein. And finally, whether or not the 10' cents withheld by his employer is being allocated for the use for which it was intended, as intimated, is also not relevant or material to a determination of the issues in this case.
*519 The only issue in the case, and one which this court has jurisdiction to determine, is whether or not plaintiff’s personal consent to withhold the 10 cents and allocate the same in accordance with the commitment above was required of the plaintiff under the circumstances herein.
It may be true that nothing can interfere with the rights of individual employees to present grievances to their employers and to have such grievances adjusted so long as the adjustment is not inconsistent with the terms and conditions of an effective collective bargaining agreement. The difficulty with plaintiff’s position is that not only was the proposed collective bargaining agreement rejected by the union membership, but also that the employer in complying with the terms of its commitment to the City Council is doing so with the consent and acquiescence of the union negotiating committee.
The union represents the entire membership and not an individual or a group of individuals. The employer association, the Mayor and the City Council had every right to assume that the union negotiating committee was empowered to make the commitment on behalf of, and as exclusive bargaining agent for, the entire union membership at the time it was made, and to rely thereon. Of course, the factual rejection of the proposed collective bargaining agreement by the union membership which included the commitment would seem to negate such authority. However, in this court’s opinion, this has become strictly an internal union dissension. To have required each of the individual members of the union to give his personal consent to withhold the 10 cents not only renders nugatory the efficacy of the union negotiating committee collectively to bargain with the employer on behalf of its employees, but would also make a mockery of collective bargaining itself.
Indeed, the employer owes no legally enforceable obligations whatever to the union membership unless and until negotiations result in a legally binding collective bargaining agreement, ratified by a majority of the union membership. And, by the same token, under the circumstances, union members may not seek to enforce only those benefits which accrue to them as a result of collective bargaining and reject others.
Angry arguments, criticisms, accusations and recriminations between negotiators have their place in the process of collective bargaining. Internal union strife has its proper place at union meetings, there to be resolved in the true democratic way, by the free will of the majority.
This courtroom is not the proper forum to entertain and air these grievances nor can this court permit the use of its facilities *520 by any of the parties hereto as a ploy in their vicarious attempts to resolve their differences.
Under these circumstances, the court is of the opinion that the employer was not required to procure plaintiff’s consent to the withholding of the 10 cents.
Complaint dismissed, with costs.